1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RODERICK T. BLACK                    No. 2:11-cv-2782-CMK-P

12              Plaintiff,

13        vs.                             MEMORANDUM OPINION AND ORDER

14   J. HANSEN, et al.,

15              Defendants.

16   _____/

17            Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983.  Pursuant to the written consent of all parties, this case is before the

19   undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28

20   U.S.C. § 636(c).  Pending[1] before the court is defendants' unopposed motion for summary

21   judgment (Doc. 38).

22   / / /

23   / / /

24   _____

25        [1]      Defendants have also filed a motion to dismiss (Doc. 42) based on plaintiff's
     failure to participate in this action. However, as discussed herein, the motion for summary
     judgment will be granted, and judgment entered in favor of defendants, which renders the motion
26   to dismiss moot.

# I.  BACKGROUND

## A.  Plaintiff's Allegations

This case proceeds on plaintiff's original complaint (Doc. 1).  The court previously summarized plaintiff's complaint as alleging the defendants violated his Equal Protection rights by including him in the groups of inmates placed and retained on lock-down based solely on his race.  He contends that after an inmate-on-inmate confrontation between black and Hispanic inmates, all inmates were on lock-down.  After just a few days, all white and Asian inmates were released from lock down as they were not involved in the confrontation.  However, all black and Hispanic inmates were retained on lock-down for a year, regardless of whether they were involved in the confrontation or not.  Plaintiff argues he was not involved in the confrontation, and was in his cell at the time.  However, he was required to remain on lock-down simply because of his race.

## B.  Undisputed Facts

Defendants submit declarations from each of the defendants, Lieutenant Mayhew, and attorney Delgado in support of their motion and statement of undisputed facts.  Plaintiff has not filed any opposition, declaration, or evidence to counter any of the statements or evidence presented by the defendants.  From the declarations presented to the court, the following relevant facts have been established and, as they are not opposed or challenged in any way, are considered undisputed:

1.  Plaintiff, an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) was housed in California State Prison, Sacramento (CSP-Sacramento) Facility B from September 2009 to January 2012;
2.  Plaintiff, an African-American, was subject to the terms of the modified program at issue from January 19, 2010 to December 28, 2010;
3.  On March 22, 2010, defendant Virga became Acting Warden and assumed full responsibility for all prison operations, including the modified program at issue;
4.  Defendant Lizarraga was serving as Associate Warden during the modified program at issue;
5.  Defendant Lizarraga attended daily and weekly meetings with defendant Virga where updates and advice regarding the modified program were provided;
6.  Defendant Leiber also served as Associate Warden at times during 2010;

/ / /

2

7.     Defendant Leiber also attended meetings with defendant Virga, providing updates and advice regarding the modified program;

8.     Defendant Mini served as the lead Facility Captain during the modified program;

9.     Defendant Mini gave defendant Virga daily and weekly updates on the status of the modified program;

10.    Defendant Mini also briefed the Warden's executive staff on all significant events that pertained to the related investigation, discovered threats, and steps being taken to return to normal programming;

11.    When staff learn of a threat to institutional safety and security, after the initial incident response is completed and the situation stabilized, the incident is assessed to determine whether it is necessary to modify or restrict programming activities for some or all inmates;

12.    After a precipitating event, the lock down committee meets and assesses the overall safety and security risk, determines what areas of the prison are affected, determines what investigations must be conducted, and decides whether to interview staff and inmates and how to collect relevant intelligence;

13.    The lock down committee submits a recommendation to the Warden as to what security measures should be instituted, and the Warden, or his or her designee, approves or rejects the recommendation;

14.    Only the Warden, or his or her designee, has the authority to adjust or terminate a modified program once it has been implemented;

15.    During a modified program, the Warden communicates with staff and the affected inmate population through periodic reports, called Program Status Reports (PSRs);

16.    PSRs update all interested parties about the status of the modified program, and they communicate the Warden's plans for returning to normal programming as soon as it is safe to do so;

17.    Warden Walker and Warden Virga delegated to Facility B's lead Correctional Captain, Facility Captain Mini, the task of preparing and updating the individual PSRs on their behalf;

18.    Captain Mini published the PSRs on a weekly or bi-weekly basis throughout the modified program;

19.    This did not mean that Captain Mini was responsible for any of the information contained in them as the PSRs reflect a Warden's intentions alone;

20.    Captain Mini did not have the authority to adjust or terminate the modified program through the PSRs; only the Warden had that authority;

21.    Following an incident leading to the modified program, an investigation occurs, wherein information is gathered as to the cause of violence, any significant security breaches, and any plans for committing acts of violence;

22.    Once the inmates who instigated the incident have been identified and removed from the general population and correctional staff determine it is safe to resume normal programming, a phased unlock may begin where inmates are released and privileges restored in stages;

23.    If, during the investigation and searches, weapons or plans for violence are discovered, additional investigations are required;

24.    If additional incidences occur during the staged unlock process, the unlock process is rescinded and the modified program may be continued;

25.    Gang activity is pervasive within CDCR, both prison gangs and disruptive groups (generally referring to street gangs), especially among Level IV general-population facilities like CSP-Sacramento Facility B;

///

3

26.    Due to the nature of gang activity within CDCR, violence between different gangs does not always only impact the gang members, sometimes inmates who are not affiliated with a gang or disruptive group are either targeted or pressured to assist gang members in violent activities;

27.    Sometimes it is necessary to place inmates on lock down or modified program who may be innocent in the triggering incident in order to protect them;

28.    Often, it is inadequate to only place the inmates known to have been directly involved in an incident on modified program in order to ensure the safety of all inmates and staff;

29.    Restrictions imposed on a particular racial or ethnic group are occasionally necessary until prison officials can determine whether the incident has a racial component or will likely lead to broader racial or ethnic violence;

30.    Even where a triggering incident does not have a racial component (e.g., the incident was between rival prison gangs), there are times when programming needs to be restricted for all inmates in a racial or ethnic group because the inmates in that group are at risk because of their racial or ethnic status;

31.    In the investigation that followed the January 19, 2010 riot, staff obtained information suggesting that *all* African-American inmates were at risk of violence from Sureño inmates or their surrogates, regardless of their gang or disruptive group status;

32.    When prison officials face this type of race-based threat of violence, the only way to protect uninvolved third parties, not to mention the intended recipients of the violence, is to modify programming for all members of that race or ethnicity until the danger is resolved;

33.    The January 19, 2010 incident precipitating the lock down/modified program at issue herein, was a riot occurring in Facility B's law library and educational classroom, involving 31 inmates;

34.    The incident appeared to be an organized attack by African-American inmates against members of the Sureño disruptive group, resulting in serious bodily injuries to two Sureño members and an inmate-manufactured weapon was found at the scene;

35.    After the January 19, 2010 riot was quelled and the situation stabilized, Warden Walker placed all inmates on Facility B on a modified program immediately, pending the outcome of an investigation;

36.    Initially, prison officials did not know whether the riot was racially or ethnically motivated, or whether it was gang-related as it involved members of different disruptive groups;

37.    Within days, prison officials concluded that the conflict was limited to African-American and ethnically-Hispanic inmates, and that the potential for additional violence was limited to Facility B's Sureños, Mexican Nationals, and African-Americans;

38.    So, the modified program was narrowed, and beginning on January 21, 2010, it only applied to inmates from those groups thereafter (i.e., it did not apply to Facility B's Caucasian or Asian inmates);

39.    A massive investigation began within days of the incident, which uncovered dozens of additional security threats, some of which were later confirmed and others which were not;

40.    The investigation included interviews and searches, which uncovered several weapons and communications between inmates ("kites") indicating the White inmate population were aligning with the Mexicans and there was a "green light" on for all African-Americans, which required any Mexican to attack any African-

American on-sight if the opportunity presented itself;

41. Additional information was uncovered during the on-going investigation indicating that the conflict was ongoing despite efforts by prison administration, and that the African-American inmates were under similar order to attack any Hispanic inmate on-sight if the opportunity was available;

42. When it was safe to do so, defendant Virga gradually loosened the restrictions on the modified program, such as allowing outside recreation in small groups and allowing inmates subject to the modified program to be escorted unrestrained;

43. Warden Virga also made several attempts to reintegrate Facility B's African-American and Sureño/Mexican National inmates;

44. After rating the inmates on risk factors, three minimal risk non-affiliated African-Americans and three minimal risk Mexican Nationals were reintegrated on June 14, 2010 on the main exercise yard;

45. When the two groups of inmates approached one another, the Mexican Nationals immediately began assaulting the three African-Americans using their fists, and one used his walking cane;

46. Correctional staff intervened and quelled the violence within moments;

47. The planned release of non-affiliated African-Americans and Mexican Nationals was suspended;

48. On July 21, 2010, a second attempt at reintegration under similar circumstances again resulted in a fight between inmates again;

49. On August 17, 2010, a third attempt at reintegration under similar circumstances had similar results;

50. In addition to these attempted reintegrations, there were several spontaneous incidents of violence during the modified program between African-American and Hispanic inmates when individuals from the two groups were inadvertently in contact;

51. In November 2010, defendant Virga learned through staff that the inmates were interested in brokering a truce;

52. On December 20, 2010, defendant Virga determined that the security conditions were favorable, so he restored various privileges for the affected inmate population, including outdoor yard, telephone, showers, work program, and visiting;

53. On December 28, 2010, the African-American, Sureño, and Mexican National inmates were returned to normal programming, and the modified program ended;

54. Among the staff at CSP-Sacramento, only the Warden or his designee has the authority to begin a modified program, adjust its terms once implemented, and end the modified program once it is started;

55. Warden Walker and Warden Virga did not have designees, and thus, they maintained sole authority to begin, adjust, and end the modified program during their respective terms of service;

56. Defendant Virga did not personally investigate the incidents that triggered the modified program, but relied on the investigations, analysis, and opinions of his staff;

57. Defendant Virga attended weekly threat assessment meetings, during which he was briefed as to the status of the modified program and threat assessments, as well as other almost daily informal meetings with his executive staff;

58. Defendant Mini also attended the daily briefings, and continuously briefed the group as to significant events, newly discovered threats, and steps taken to safely return to normal programming;

///

59. Based on Captain Mini's updates, Warden Virga did not think that it was safe to return Facility B's Sureño and African-American inmates to normal programming at any time from January 19, 2010 to December 28, 2010 (the complaint period), and he determined that it was necessary to maintain the restrictions on programming for these inmate groups;

60. Insofar as the modified program applied to Facility B's African-American inmates as a group, Warden Virga thought that this was necessary because of the danger that all African- Americans faced during the conflict with the Sureños;

61. Investigators learned that the Sureños and Mexican Nationals were operating under a "green light" order, issued by the Mexican Mafia, directing that all African-Americans were to be attacked on-sight;

62. The order did not differentiate between affiliated or non-affiliated inmates, or between inmates belonging to different disruptive groups—*all* African-Americans on Facility B were at risk;

63. For this reason, Warden Virga concurred with Warden Walker's decision to place all African-Americans on Facility B on modified program as a group, and it is why he continued the modified program on these terms when he became Acting Warden;

64. Defendant Virga did not thinking other options, such as shifting prisoners, were viable, given other safety and rehabilitation considerations;

65. All restrictions imposed on the affected inmate population were imposed with the sincere belief that the restrictions would be effective in preventing further acts of violence and would help to restore order;

66. Based upon the reports they received, Warden Virga and the rest of his executive staff believed that the modified program: (1) was necessary to protect the lives of correctional staff and inmates because of significant and credible threats of continued violence; (2) was a response to severe and unusually high levels of violence at the prison; (3) was designed solely to protect the lives and safety of inmates and correctional staff members who were in imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass anyone; and (6) did not violate any statutory or constitutional rights.

(Mot. for Summ. J., Doc. 38-2).

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

1    judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

2    to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered,

3    after adequate time for discovery and upon motion, against a party who fails to make a showing

4    sufficient to establish the existence of an element essential to that party's case, and on which that

5    party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning

6    an essential element of the nonmoving party's case necessarily renders all other facts

7    immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

8    whatever is before the district court demonstrates that the standard for entry of summary

9    judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

10           If the moving party meets its initial responsibility, the burden then shifts to the

11   opposing party to establish that a genuine issue as to any material fact actually does exist. See

12   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

13   establish the existence of this factual dispute, the opposing party may not rely upon the

14   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

15   form of affidavits, and/or admissible discovery material, in support of its contention that the

16   dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

17   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

18   of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

19   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

20   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

21   for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

22           In the endeavor to establish the existence of a factual dispute, the opposing party

23   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

24   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

25   versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

26   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

1   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

2   committee's note on 1963 amendments).

3          In resolving the summary judgment motion, the court examines the pleadings,

4   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

5   any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

6   Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

7   before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

8   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

9   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

10  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

11  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

13  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

15                          **III.  DISCUSSION**

16          Plaintiff alleges defendants violated his Equal Protection rights under the

17  Fourteenth Amendment rights by placing and retaining him on lock-down based solely on his

18  race.  Defendants Mini, Leiber, and Lizarraga contend they, as subordinate employees, were not

19  responsible for the lock-down/modified programming, had no authority as to how it occurred or

20  low long it lasted, and therefore had no personal involvement in any alleged constitutional

21  violation that plaintiff alleges occurred.  Defendant Virga, as warden at California State Prison,

22  Sacramento (CSP-Sacramento), contends that he was the one responsible for the decisions as to

23  whether to place and/or keep the institution on modified programming, and he did so based on a

24  legitimate state interest, namely prison safety.

25          Defendants Mini, Leiber, and Lizarraga all support their contention that they were

26  not personally involved in any of the decisions regarding the modified programming at issue in

this case, with their own declarations as well as that of warden Virga.  As plaintiff offers no

evidence or argument to counter their position, the court finds it undisputed that none of these

three subordinate defendants were responsible for the modified programming decisions.  As

such, they had no personal involvement in plaintiff's alleged constitutional violations.

"A person 'subjects' another to the deprivation of a constitutional right, within the

meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts, or

omits to perform an act which he is legally required to do that causes the deprivation of which

complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  Here, defendants

have met their burden to show Mini, Leiber, and Lizarraga were all subordinate employees and

were not the decision makers.  While these defendants acted according to their duties,

investigating and informing the Wardens as to the status of the threat and programing, only the

warden had the authority to make the decisions as to plaintiff's involvement in the modified

program.  Thus, the burden shifts to plaintiff to show some evidence that these defendants were

personally responsible for actions he claims violated his rights.  As the motion is unopposed,

plaintiff offers no such evidence or otherwise supports his claims.  Summary judgment is

therefore appropriate as to defendants Mini, Leiber, and Lizarraga.

As to defendant Virga, he acknowledges that as the Warden, he alone had the

authority and decision making duties as to whom to include in the modified program, the

parameters of the modified program, and the termination of the modified program plaintiff

claims violate his equal protection rights.  He contends, however, that no violation of plaintiff's

equal protection rights occurred.

Equal protection claims arise when a charge is made that similarly situated

individuals are treated differently without a rational relationship to a legitimate state purpose.

See San Antonio School District v. Rodriguez, 411 U.S. 1 (1972).  Prisoners are protected from

invidious discrimination based on race.  See Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

Racial segregation is unconstitutional within prisons save for the necessities of prison security

1   and discipline.  See Cruz v. Beto, 405 U.S. 319, 321 (1972) (per curiam).  Prisoners are also

2   protected from intentional discrimination on the basis of their religion.  See Freeman v. Arpaio,

3   125 F.3d 732, 737 (9th Cir. 1997).  Equal protection claims are not necessarily limited to racial

4   and religious discrimination.  See Lee v. City of Los Angeles, 250 F.3d 668, 686-67 (9th Cir.

5   2001) (applying minimal scrutiny to equal protection claim by a disabled plaintiff because the

6   disabled do not constitute a suspect class) see also Tatum v. Pliler, 2007 WL 1720165 (E.D. Cal.

7   2007) (applying minimal scrutiny to equal protection claim based on denial of in-cell meals

8   where no allegation of race-based discrimination was made); Hightower v. Schwarzenegger,

9   2007 WL 732555 (E.D. Cal. March 19, 2008).  Strict scrutiny applies to equal protection claims

10  alleging race-based or religious discrimination (i.e., where the plaintiff is member of a "protected

11  class"); minimal scrutiny applies to all other equal protection claims.  See Lee v. City of Los

12  Angeles, 250 F.3d 668, 686-67 (9th Cir. 2001).

13          To violate the Equal Protection Clause of the Fourteenth Amendment, the

14  defendants have to act with intentional discrimination against plaintiff, or against a class of

15  inmates which included plaintiff, and such conduct does not relate to a legitimate penological

16  purpose.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (holding that equal

17  protection claims may be brought by a "class of one"); Reese v. Jefferson Sch. Dist. No. 14J, 208

18  F.3d 736, 740 (9th Cir. 2000); Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998);

19  Federal Deposit Ins. Corp. v. Henderson, 940 F.2d 465, 471 (9th Cir. 1991); Lowe v. City of

20  Monrovia, 775 F.2d 998, 1010 (9th Cir. 1985).

21          Here, defendant Virga has produced evidence that the modified program, which

22  he acknowledges was explicitly race-based in that it applied to all African-American inmates on

23  Facility B, was based on legitimate prison goals of security and safety.  As defendant Virga

24  argues, the government does have a compelling interest in maintaining institutional security.  See

25  Johnson v. California, 543 U.S. 499, 514 (2005).  He has produced evidence that all African-

26  American inmates on Facility B were at risk of violence, either from other African-Americans or

from Hispanic inmates, each of whom were operating under gang related orders to attack the others on-sight.  As the risk to the prison, staff, and inmates were wide spread, and the threat involved all African-American and Hispanic inmates, evidence supports defendant Virga's contention that the modified program was necessary to ensure the safety of prisoners and staff. The evidence also supports his contention that the modified program was narrowly tailored to combat the threat of race-based violence.  Even though plaintiff may not have been involved in the incident nor an active member of any gang, defendant Virga produced evidence that even non-affiliated African-American inmates were at risk, such as during the reintegration attempts where non-affiliated African-American inmates were released with Hispanic inmates.  The result was inmate on inmate violence, regardless of the gang affiliation, or lack thereof.  Finally, he produced evidence that the modified program was ended once the threat of safety and violence was resolved, and did not last longer that deemed necessary based on the risks.

Again, as plaintiff has failed to oppose the motion, he offers no evidence to contradict the evidence presented.  Based on the above, defendant Virga has met his burden to show no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law.  The burden then shifts to plaintiff, who fails to meet his burden due to his lack of opposition.  The undisputed facts show no violation of plaintiff's equal protection rights.  While the modified program was race-based, defendants have produced undisputed evidence that the modified program was necessary to maintain prison security, and was as narrowly tailored as possible to protect that security given the particular threat of violence.  Therefore, summary judgment is appropriate in favor of defendant Virga.

## IV.  CONCLUSION

The undersigned finds no genuine issue as to any material fact.  Given the evidence produced by the defendants, and plaintiff's lack of opposition to the motion for summary judgment, it stands that defendants did not act in violation of plaintiff's Fourteenth Amendment rights.

1        Accordingly, IT IS HEREBY ORDERED that:

2        1.      Defendants' motion for summary judgment (Doc. 39) is granted;

3        2.      Defendants' motion to dismiss for plaintiff's lack of participation (Doc.

4    36) is denied as moot; and

5        3.      The Clerk of the Court is directed to enter judgment and close this case .

6

7    DATED:  March 19, 2015

8

9                                            **CRAIG M. KELLISON**
                                             UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26